UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ORTHOGON CHARTER SCHOOL SPECIAL
OPPORTUNITIES LLP, ORTHOGON CHARTER
SCHOOL SPECIAL OPPORTUNITIES II, LP and
ORTHOGON CHARTER SCHOOL SPECIAL
OPPORTUNITIES III, LLC,

               Plaintiffs,

               v.

STUART ELLIS and BRAD COBURN,

               Defendants.

Civ. Action No.  25-cv-7193

**COMPLAINT**

---

Plaintiffs Orthogon Charter School Special Opportunities LLP, Orthogon Charter School

Special Opportunities II, LP and Orthogon Charter School Special Opportunities III, LLC

(collectively, "Orthogon" or "Plaintiffs") by their attorneys, Beys Liston & Mobargha LLP, as

and for their Complaint against Defendants Stuart Ellis ("Ellis") and Brad Coburn ("Coburn"

and, together with Ellis, the "Defendants") allege as follows:

### NATURE OF THE ACTION

1.    Defendants Ellis and Coburn – the two co-founders of non-party Charter School

Capital, Inc. ("CSC"), who serve as CSC's Chief Executive Officer and Chief Investment

Officer, respectively – drove the once profitable CSC into bankruptcy.  CSC filed a Chapter 11

Petition on June 8, 2025 in the United States Bankruptcy Court for the District of Delaware.

Plaintiffs have invested tens of millions of dollars into CSC and are the holders of a majority of

CSC common stock and all of CSC's preferred stock.  Plaintiffs are owed more than $15 million

in accrued, unpaid dividends, and approximately $3.2 million resulting from an arbitration award

they obtained against CSC in May 2025.

2.      For at least the last several years, Ellis and Coburn have engaged in a destructive course of conduct that bankrupted CSC.  Throughout, Ellis and Coburn have been focused on enriching themselves no matter their duties to others.

3.      In 2023, Ellis and Coburn committed fraud by inducing Plaintiffs to purchase more than $11 million in CSC preferred shares based on materially false financial information Defendants provided to Plaintiffs.  As detailed herein, among other things, non-party Charter School Capital, Inc. ("CSC"),  and the Defendants falsified satisfaction of an asset coverage test that was a precondition to any sale of preferred stock by CSC to Plaintiffs.

4.      Plaintiffs relied upon a CSC Officer's Certificate signed by Coburn that CSC was in compliance with the terms of its agreements, including an Asset Coverage Test – to purchase more than $11 million dollars of preferred stock from CSC. CSC later acknowledged that, in determining whether the Asset Coverage Test had been satisfied for these sales of preferred stock, it did not include an approximately $15,000,000 liability in the calculation.  Therefore, the value of the entire real estate portfolio was overstated by $15 million, an enormous misstatement on a real estate portfolio valued at less than $50 million.  Had CSC included that liability in the calculation, CSC would have failed the Asset Coverage Test for the sale of preferred stock to Plaintiffs.

5.      In a recent arbitration between CSC and Orthogon, an arbitrator found that CSC provided false information to Orthogon in connection with these 2023 purchases.  In his Award dated May 22, 2025, the Arbitrator found, in connection with Orthogon's investment in CSC, that CSC had provided information to Orthogon stating that "CSC's working capital as measured by net assets was at least twenty percent greater than Orthogon's investment."  However, this

information was false.  In reality, "a fifteen-million-dollar liability had been omitted from [CSC's] balance sheet. Including this liability, not only would there not have been a surplus of assets to provide security against the funds invested, but the correct balance sheet would have shown the company was already underwater. . . . It is sufficient to observe that had Orthogon been provided an accurate [Asset Coverage Test] result, it would not have invested in CSC."

6.      After Plaintiffs learned of Defendants' deception, Plaintiffs and Defendants entered into discussions.  As the arbitrator observed in his Award: "Orthogon wanted its money back. To forestall litigation and to provide for an orderly liquidation of assets to avoid litigation and bankruptcy, the Parties entered into the Framework on June 24, 2024."

7.      The Framework was a separate agreement between Orthogon and CSC to try to resolve the issue of CSC and the Defendants' misstatements in a manner less disruptive to the company than litigation or other alternatives.  In general, the Framework obligated CSC and Defendants to sell assets and then take direction from Orthogon about how to use the proceeds from those monetizations. But Defendants then caused CSC to breach the Framework by failing to abide by Orthogon's directives regarding asset monetization proceeds.  As the Arbitrator found, "the officers of CSC ignored their obligations under the Framework.  The testimony of [CSC CEO] Stuart Ellis that he owed Orthogon no duties until there was a signed tolling agreement and/or final documentation is unreasonable.  CSC and its officers benefited from the forbearance of Orthogon not to pursue legal action that could have forced CSC into bankruptcy. In return, CSC should have known that Orthogon expected to receive the benefit of the terms of the Framework, as its express terms make clear, during the period of finalizing and documenting their agreement.  This was not an agreement that CSC could have abandoned, thus the terms of their Framework should have been binding."  Because of the breaches of the Framework,

Orthogon was awarded approximately $3.2 million against CSC.

8.        Defendants caused CSC to use the proceeds from its sales of preferred stock to Orthogon to enrich itself and Defendants and drain money from CSC that should have been returned to Orthogon.

9.        Defendants breached a Shareholders Agreement they signed as individuals. Under that agreement, CSC may not sell certain properties without Orthogon's consent. But not only did Defendants sell properties without Orthogon's consent, they did so even over Orthogon votes against such transactions.

## THE PARTIES

10.        Plaintiff Orthogon Charter School Special Opportunities LLP is a Delaware limited liability partnership.

11.        Plaintiff Orthogon Charter School Special Opportunities, II, LP is a Delaware limited partnership.

12.        Plaintiff Orthogon Charter School Special Opportunities, III, LLC is a Delaware limited liability company.

13.        Defendant Stuart Ellis is the Chief Executive Officer and Co-Founder of CSC. Ellis resides in Portland, OR.

14.        Defendant Brad Coburn is the Chief Investment Officer and Co-Founder of CSC, and signed the Officer's Certificates that represented that CSC was in compliance with its covenants under the Forward Purchase Agreement, including satisfaction of the Asset Coverage Test. Coburn resides in Orinda, CA.

## JURISDICTION AND VENUE

15.        This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act

of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa.  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.  This court has supplemental jurisdiction over the state law causes of action.

16.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## FACTUAL BACKGROUND

17.     CSC is a specialty finance company focused on providing short-term and long-term financing solutions to charter schools across the United States.  CSC began operations in 2006 and, as of 2023, had over 55 employees.  CSC has two primary business lines: Receivables where CSC finances schools by purchasing receivables owed by state and municipal governments to provide schools with immediate liquidity and Real Estate where CSC acquires school buildings rented by charter schools which are then bundled into a portfolio and sold or securitized, e.g., via a municipal bond issuance.

**A.     Orthogon's Initial Investment in CSC**

18.     In May 2017, Orthogon Charter School Special Opportunities LLP ("OCSS") purchased 40% of the common stock of CSC from a former financial sponsor.  Following OCSS's purchase of the stock, OCSS appointed a director of CSC.  As part of the transaction, OCSS purchased $10,000,000 of preferred stock ("Series P3 Preferred Stock").

**B.     CSC and OCSS Enter the Forward Purchase Agreement and Shareholders Agreement**

19.     In the Spring of 2018, CSC and OCSS entered into a series of agreements pursuant to which OCSS committed to making additional purchases of three classes of CSC's

preferred stock, referred to as the Series P3 Preferred Stock, the Series P8 Preferred Stock and the Series P15 Preferred Stock (defined below).

20.     In March 2018, CSC adopted and filed with the Secretary of State of Delaware a restated Certificate of Incorporation (the "Restated Certificate") describing the rights, preferences, privileges and restrictions of 5000 shares of the Series P3 Preferred Stock, 15,000 shares of Series P8 Preferred Stock (the "Series P8 Preferred Stock") and 15,000 shares of Series P15 Preferred Stock (the Series P15 Preferred Stock), collectively, the "Preferred Stock."

21.     Concurrently with CSC adoption of the Restated Certificate, on March 21, 2018, CSC and OCSS entered into a Shareholders Agreement and a Forward Purchase Agreement.  In connection with entry into these agreements, CSC redeemed 5,000 of the shares of Series P3 Preferred Stock issued to OCSS in May 2017 for an aggregate purchase price of $5,000,000 (the "August P3") and provided a warrant to OCSS.  In consideration of the warrant and the rights granted pursuant to the Shareholders Agreement and the Forward Purchase Agreement, OCSS paid to CSC $7,000,000 less the $5,000,000 redemption amount for the P3 Preferred Stock and all accrued and unpaid dividends as of the date of the Forward Purchase Agreement on the 5000 shares of P3 Preferred issued to OCSS on May 3, 2017 for an aggregate purchase price of $5,000,000 (the "May P3").

22.     Under the Forward Purchase Agreement, OCSS committed, subject to various conditions, to purchase from CSC at a purchase price of $1,000 per share (i) up to 5,000 shares of Series P3 Preferred Stock for an aggregate purchase price of up to $5,000,000, (ii) up to ten thousand (10,000) shares of Series P8 Preferred Stock for an aggregate purchase price of up to ten million ($10,000,000) which maximum amount would increase to $15,000,000 either with (A) the prior written consent of OCSS in its sole discretion or (B) if funds under common control with OCSS completed a capital raise of at least $100,000,000 of fee earning capital to such

funds' committed capital and (iii) up to 15,000 shares of Series P15 Preferred Stock for an aggregate purchase price of up to $15,000,000.

23.     Section 1(b)(iii) of the Forward Purchase Agreement describes the conditions governing OCSS's purchase of Preferred Stock.  Under that provision, OCSS had no obligation to purchase Preferred Stock from CSC if, among other conditions, (i) there were any dividends due and payable, but not paid, (ii) the Company was in breach in any material respect of the Forward Purchase Agreement, the Restated Certificate or the Shareholders' Agreement or the Warrant, or (iii) the Asset Coverage Test  (as described below) was not satisfied as of the proposed additional closing of any Preferred Stock sales.

24.     Section 1(b)(iv) of the Forward Purchase Agreement provides that at each Additional Closing, CSC shall deliver to OCSS an Officer's Certificate executed by CSC's Chief Financial Officer stating that "(A) the representations and warranties of the Company in Section 4 [of the Forward Purchase Agreement] are true and correct in all material respects, (B) the Company is in and has at all times been in compliance with the covenants in Section 2 of the Forward Purchase Agreement in all material respects and (C) the Company is not in breach in any material respect of this Agreement, the Restated Certificate, the Shareholders Agreement or the Warrant in each case as of such Additional Closing."

C.     **The Asset Coverage Test Under the Forward Purchase Agreement**

25.     In Section 2 of the Forward Purchase Agreement, CSC covenanted that for each class of Preferred Stock measured as of the Effective Date and each Additional Closing, the Company must have assets in excess of liabilities secured by qualifying assets ("Net Assets") meeting the following conditions (the "Asset Coverage Test"), in each case evaluated on a "lower of cost or market" basis.

26.     For the Series P3 Preferred Stock, the Asset Coverage Test provided that the

aggregate amount of Series P3 Preferred Stock outstanding (including any accrued but unpaid dividends) may not exceed the Company's Net Assets. For purposes of that calculation, the only assets that qualified as Net Assets were cash on hand and any investment assets listed on Annex A to the Forward Purchase Agreement that (1) are purchased or financed in the ordinary course of business, (2) have a duration of less than 18 months, (3) are liquidating via direct payment from a sovereign entity, and (4) in the reasonable judgment of CSC, if rated, would be rated A1P1 or AA- or better (collectively, the ("Series P3 Assets").

27.    For the Series P8 Preferred Stock, the Asset Coverage Test provided that the aggregate amount of Series P8 Preferred Stock outstanding (including any accrued but unpaid dividends) may not exceed the Company's Net Assets. Net Assets are (A) the aggregate amount of Series P3 Assets less the aggregate amount of Series P3 Preferred Outstanding and (B) any investment assets listed on Annex A that are purchased or financed in the ordinary course of CSC's business (collectively, the "Series P8 Assets").

28.    For the Series P15 Preferred Stock, the Asset Coverage Test provided that the aggregate amount of Series P15 Preferred Stock outstanding (including any accrued but unpaid dividends) may not exceed 80% of CSC's Net Assets. Net Assets for purposes of that calculation are (A) the aggregate amount of P8 Assets less aggregate amount of Series P8 Preferred Outstanding and (B) any investment assets listed on Annex A that are purchased or financed in the ordinary course of CSC's business (collectively, the "Series P15 Assets").

29.    Section 2(e) of the Forward Purchase Agreement provides that OCSS shall serve as the calculation agent with respect to all calculations under the Forward Purchase Agreement, including, without limitation, regarding EBITDA, Net Assets (including without limitation, P3 Assets, P8 Assets and P15 Assets) … and OCSS's calculations shall be binding unless shown to be wrong to a "clear and convincing" standard under the evidentiary principles

of Delaware law.

30.    The term of the Forward Purchase Agreement terminated on January 1, 2020.

D.    **The Shareholders' Agreement between CSC and OCSS**

31.    Also on March 21, 2018, CSC, OCSS, Stuart Ellis and the other equity holders of CSC entered into a shareholders agreement (the "Shareholders Agreement").

32.    Section 5.1 of the Shareholders Agreement provides that CSC's board of directors would consist of four members, with three members designated by Ellis (the "Ellis Directors"), two of whom would initially be Stuart Ellis and Brad Coburn and one member designated by OCSS, who initially would be Rishi Ganti. A fourth member of the board was never designated.

33.    Section 5.2 of the Shareholders Agreement requires approval of certain actions of CSC.  It provides that "[w]ithout the prior written approval of the Board, Ellis and OCSS . . . the Company will not, and will not permit any of its Subsidiaries to, directly or indirectly (a) Engage in a Sale Transaction . . . (c) Sell, lease or otherwise dispose of material assets outside of the ordinary course of business.

34.    "Sale Transaction" under the Shareholders Agreements means "a transaction or a series of transactions involving either: (a) the sale, lease, transfer, exclusive license, conveyance or other disposition, in one transaction or a series of relating transactions (including by way of merger, consolidation, recapitalization, reorganization or transfer of securities of one or more of the Company's subsidiaries) of all, substantially all, or any material assets, of the Company and its  subsidiaries other than in the ordinary course of business . . . ."

E.    **Orthogon's Purchases of Preferred Stock and Amendments to the Forward Purchase Agreement**

35.    In connection with OCSS's purchase of preferred stock from CSC, the parties amended the Forward Purchase Agreement to extend the term of the agreement and to provide

for additional Series P15 Preferred Stock closings.  Thus, CSC and OCSS executed a First Amendment to the Forward Purchase Agreement on March 31, 2020, which reinstated the Purchase Agreement and extended the term of the agreement until September 30, 2020 and provided for OCSS to purchase up to 10,000 shares of Series P15 Preferred Stock for an aggregate purchase price of up to $10,000,000.

36.    On November 23, 2020, CSC, OCSS and Orthogon Charter School Special Opportunities, II, LP ("OCSS II") executed a Second Amendment to the Forward Purchase Agreement which made OCSS II a signatory and party to the Forward Purchase Agreement, extended the term of the Forward Purchase Agreement until September 30, 2022, and provided for OCSS and OCSS II to purchase up to 30,000 shares of Series P15 Preferred Stock.  In addition, pursuant to the Second Amendment to the Forward Purchase Agreement, CSC consented to the designation of OCSS II as a Designated Purchaser and Investor under the agreement.

37.    On April 30, 2021, CSC, OCSS, and OCSS II executed a Third Amendment to the Forward Purchase Agreement which provided for OCSS and OCSS II to purchase up to 35,000 shares of Series P15 Preferred Stock for an aggregate purchase price of up to $35,000,000.

38.    On December 3, 2021, CSC, OCSS and OCSS II executed a Fourth Amendment to the Forward Purchase Agreement which provided for OCSS and OCSS II to purchase up to 50,000 shares of Series P15 Preferred Stock for an aggregate purchase price of up to $50,000,000.

39.    On March 15, 2023, CSC, OCSS, OCSS II and Orthogon Chatter School Special Opportunities, III, LLC ("OCSS III") executed a Fifth Amendment to the Forward Purchase Agreement which made OCSS III a signatory  and party to the Forward Purchase

Agreement, reinstated the Forward Purchase Agreement, and provided for OCSS, OCSS II and OCSS III to purchase up to 50,000 shares of Series P15 Preferred Stock up to an aggregate purchase price of $50,000,000. In addition, pursuant to the Fifth Amendment to the Forward Purchase Agreement, CSC consented to the designation of OCSS III as a Designated Purchaser under the agreement.

F.  **Purchase of $7.6 million of Series P15 Preferred Stock and Deferral of Preferred Dividends in March 2023**

40.  On March 14, 2023, OCSS III purchased $7.6 million of Series P15 Preferred Stock from CSC.

41.  In connection with OCSS III's purchase of the Preferred Stock, CSC provided Orthogon with a coverage metric for the Asset Coverage Test showing $37.2MM of preferred stock plus accrued dividends outstanding against $49.7MM of assets (cost basis). The ratio of those two figures is 75%. Therefore, based on the information that CSC provided OCSS III, CSC claimed it had satisfied the 80% Asset Coverage Test. An excerpt from the Asset Coverage Test provided by CSC to Orthogon on shows the following:

| P15 Test | |
|---|---|
| Net Assets | |
| (A) Aggregate P8 Assets less P8 Preferred Outstanding | $19,593,078 |
| (B) Other assets approved by Investor | $30,085,545 |
| **Total Net Assets** | **$49,678,623** |
| P15 Preferred Outstanding plus Accrued Dividends | $37,153,728 |
| 80% Test | 75% |
| **Test** | **True** |

42.  CSC also provided Plaintiffs with an Officer's Certificate executed by Brad Coburn which falsely stated, among other things, that (a) the representations and warranties of the Company in Section 4 of the Forward Purchase Agreement were true and correct in all material respects; (b) that the Company was in and had at all times been in compliance with the covenants

11

in section 2 of the Forward Purchase Agreements in all material respects (i.e., including the Asset Coverage Test); and (c) the Company was not in breach in any material respect of the Forward Purchase Agreement, the Restated Certificate (as amended through and including the date hereof), the Shareholders Agreement or the Warrant, in each case as of the date of the Officer's Certificate.

43.     In reliance on the information provided by CSC to OCSS II and representations made in the Officer's Certificate, OCSS III agreed to fund $7.6 million to CSC to purchase 7600 shares of Series P15 Preferred Stock.

44.     Also in reliance upon the information provided by CSC to OCSS II and OCSS III and representations made in the Officer's Certificate, OCSS II and OCSS III further agreed to defer payment of preferred dividends due in June 2023 and December 2023, instead allowing such preferred dividends to compound on such dates in accordance with the Restated Certificate.

**G.    Purchase of $4,000,000 of Series P15 Preferred Stock on June 1, 2023**

45.     On June 1, 2023, OCSS III purchased 4000 shares of Series P15 Preferred Stock from CSC for $4,000,000.

46.     In connection with OCSS III's purchase of the Preferred Stock, CSC provided OCSS III with a coverage metric for the Asset Coverage Test showing $42.7MM of preferred stock plus accrued dividends outstanding against $53.6MM of assets (cost basis). The ratio of those two figures is 79%. Therefore, based on the information that CSC provided OCSS III, CSC claimed it once again satisfied the 80% Asset Coverage Test.  An excerpt from the Asset Coverage Test provided by CSC to Orthogon on June 1, 2023 shows the following:

| P15 Test | |
| --- | --- |
| **Net Assets** | |
| (A) Aggregate P8 Assets less P8 Preferred Outstanding | $14,119,113 |
| (B) Other assets approved by Investor | $39,472,783 |
| **Total Net Assets** | **$53,591,896** |
| | |
| P15 Preferred Outstanding plus Accruded Dividends | $42,563,801 |
| | |
| 80% Test | 79% |
| **Test** | **True** |

47.      CSC also provided Plaintiffs with an Officer's Certificate executed by Brad Coburn which falsely stated, among other things, that (a) the representations and warranties of the Company in Section 4 of the Forward Purchase Agreement were true and correct in all material respects; (b) that the Company was in and had at all times been in compliance with the covenants in section 2 of the Forward Purchase Agreements in all material respects (i.e., including the Asset Coverage Test); and (c) the Company was not in breach in any material respect of the Forward Purchase Agreement, the Restated Certificate (as amended through and including the date hereof), the Shareholders Agreement or the Warrant, in each case as of the date of the Officer's Certificate.

48.      In reliance on the information provided by CSC to OCSS III and the representations made in the Officer's Certificate, OCSS III agreed to fund $4 million to CSC to purchase 4000 shares of Series P15 Preferred Stock.

## H.    Orthogon Discovers that CSC Did Not Include a $15,000,000 Liability in its Calculations

49.       On August 30, 2023, Orthogon separately held a call with Brad Coburn of CSC regarding a failed bond issuance intended to securitize a portion of its real estate portfolio. During this call, CSC presented values of CSC's real estate portfolio. Orthogon

pointed out a discrepancy between CSC's discussions of asset values during that call with values that CSC had previously provided Orthogon towards the issuance of the Series P15 Preferred Stock. In particular, the discrepancy was that in the Asset Coverage Tests, CSC did not disclose to Orthogon that it had a large, approximately $15 million "tenant improvement liability" related to one of its largest properties (DuBois). Therefore, the value of the entire real estate portfolio was overstated by $15 million, an enormous misstatement on a real estate portfolio valued at less than $50 million. In essence, CSC overstated the value of the portfolio by over 30%, affecting, *inter alia*, the Asset Coverage Tests.

50.      CSC either knowingly excluded this liability or recklessly disregarded it in preparation of the Asset Coverage Tests: $15 million represented approximately a third of its total investment portfolio. It is an enormous misstatement.

### I.      CSC Has Been Using the Proceeds of the Preferred Stock Issuances to Enrich Itself and Is Financing or Selling Assets in Violation of the Shareholders Agreement

51.      Instead of working to return this money that it fraudulently obtained from Orthogon, for years CSC has effectively been using available cash to pay salaries and other operational expenses.  In particular, CSC has been monetizing assets bought with Orthogon investor capital (through sale, recapitalization, etc.) to pull out money to pay itself, not to return the wrongly obtained proceeds back to Orthogon.  In other words, CSC has been pulling cash from the assets (e.g., by increasing borrowings against them) and using this cash for CSC salaries and expenses. CSC has therefore rapidly eroded the equity value of the real estate assets that should have been used to pay back Orthogon investors.

52.      CSC shows no signs of stopping the cash drain and is in fact is now taking extraordinary actions outside the ordinary course of business and in violation of the Shareholders Agreement, to attempt to sell or refinance portions of the real estate subsidiaries

that hold the assets Orthogon investors have effectively purchased, further diverting cash and asset value away from repaying Orthogon investors. CSC has been taking these actions in violation of the Shareholders' Agreement, as detailed below.

53.        CSC sold assets over the repeated objections of Orthogon to sell or refinance equity in its real estate subsidiaries. Of course, it is these very subsidiaries that are needed to pay back Orthogon investors. And, of course, CSC will and did take any cash it can obtain from these sales to pay salaries and other expenses.

54.        When cash was not available to CSC to fund operations in early 2024, the Individual Defendants invested $700,000 in the form of an unsecured loan to a real estate subsidiary of CSC. Any subsequent sales of underlying real estate assets would have to repay this loan plus 16% per annum interest to the Individual Defendants. This related-party transaction outside the ordinary course of business was carried out despite Orthogon's objections regarding self-dealing and in violation of Section 5.2(f) of the Shareholder's Agreement.

55.        Orthogon has supported monetization (refinancing or sale of assets) where such proceeds would be used to pay back Orthogon investors. However, CSC has been monetizing assets in order to pay itself, leaving the Orthogon investors, who are preferred shareholders in CSC, without recovery.  CSC should not have been monetizing assets to pay itself instead of returning capital to Orthogon investors. This is an improper purpose and a clear breach of the Shareholders' Agreement and a breach of its fiduciary duties to Orthogon.

## AS AND FOR A FIRST CAUSE OF ACTION
### VIOLATIONS OF SECTION 10(b) OF THE 1934 ACT

56.        Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs. a continuous course of conduct to conceal, either knowingly or but for their reckless disregard of the truth, adverse material information about the Company.

57.     Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts about CSC. Specifically, Defendants knew or, but for their reckless disregard of the truth, should have known that, at the time it sold the preferred stock to Orthogon, that CSC did not meet the Asset Coverage Test in the Forward Purchase Agreement because of an undisclosed $15 million tenant improvement liability.

58.     Defendants, as the top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers or directors, or through their extensive stock ownership, Defendants were able to and did control the content of the information disseminated to Plaintiffs in connection with the preferred stock purchases.  With knowledge of, or reckless disregard for, the falsity and misleading nature of the statements contained therein, Defendants caused the information disseminated to Plaintiffs to contain misstatements and omissions of material facts as alleged herein.

59.     Defendants misrepresented the state of the CSC real estate portfolio to Orthogon, acting with scienter in making the false or materially misleading statements to Plaintiffs in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Given the enormous size of the tenant improvement liability, $15 million, which represents nearly one-third of CSC's real estate portfolio, it would strain credulity for Defendants not to have known about that liability when they induced Plaintiffs to purchase the preferred stock from CSC.

60.     The Defendants constituted the senior management of the Company and were

therefore directly responsible for the false and misleading statements and omissions disseminated to Plaintiffs.

61.    Defendants' misrepresentations were intentional or reckless and done for the purpose of enriching themselves at the expense of Plaintiffs and to conceal the Company's true operating condition.

62.    As a result of these deceptive practices and false and misleading statements, Defendants were able to sell Preferred Stock to Plaintiffs.  In ignorance of the false and misleading nature of the representations and omissions described above and the deceptive and manipulative devices employed by Defendants, Plaintiff relied upon the false statements and reports of defendants, purchased CSC preferred stock and were damaged thereby.  Had Plaintiffs known of the material adverse information not disclosed by Defendants, particularly that the Asset Coverage Test supplied by defendants was materially misstated, they would not have purchased these issuances of CSC's Preferred Stock.

63.    By virtue of the foregoing, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and damaged Plaintiffs.  Plaintiffs are entitled to damages in an amount to be proven at trial.

**AS AND FOR A SECOND CAUSE OF ACTION**
**VIOLATIONS OF SECTION 20 OF THE 1934 ACT**

64.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

65.    Each of the Defendants acted as a "controlling person" of CSC within the meaning of Section 20 of the 1934 Act.  Specifically, Ellis had the power and authority to cause CSC to engage in the wrongful conduct complained of herein by virtue of his positions as CEO and Co-Founder of CSC.  Coburn, as Chief Investment Officer and Co-Founder of CSC, was also in a position of power and authority to cause CSC to engage in the wrongful acts complained of

herein.

66.     As set forth above, Coburn signed the Officer's Certificates that were provided to Plaintiffs to induce them to purchase the preferred stock.

67.     By reason of the wrongful conduct alleged herein, the Individual Defendants are liable pursuant to Section 20(a) of the 1934 Act.

68.     As a direct and proximate result of their wrongful conduct, Plaintiffs suffered damages in an amount to be proven at trial.

### AS AND FOR A THIRD CUASE OF ACTION
### VIOLATION OF DELAWARE'S SECURITIES ACT § 73-201 ET SEQ.

69.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

70.     In connection with Plaintiffs' purchases of CSC Preferred Stock, Defendants made untrue statements of material fact and omitted statements of material fact regarding CSC's financial condition in order to obtain Plaintiff's investments despite Defendants' precarious financial situation. Specifically, Defendants knew or should have known that, at the time they sold the Preferred Stock to Plaintiffs, CSC did not meet the Asset Coverage Test in the Forward Purchase Agreement because Defendant had not disclosed a $15 million tenant improvement liability.

71.     Defendants knowingly, or but for their reckless disregard of the truth, provided the materially misstated Asset Coverage Test to the Plaintiffs to induce the purchase CSC Preferred Stock.

72.     Plaintiffs have suffered monetary damages as a result of Defendants' false statements and omissions of material fact and fraudulent conduct regarding the validity of the Asset Coverage Test when agreeing to waive payments on dividends of Preferred Stock

for 2023 and when agreeing to purchase shares of the Series P15 Series Preferred Stock in March and June 2023.

## AS AND FOR A FOURTH CAUSE OF ACTION
### FRAUD

73.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

74.     In connection with Plaintiffs' purchases of CSC preferred stock, Defendants made material misrepresentations of fact regarding CSC's financial condition in order to obtain Plaintiff's investments despite Defendants' precarious financial situation.  Specifically, Defendants knew or, but for their reckless disregard of the truth, should have known that, at the time they sold Preferred Stock to Plaintiffs, that CSC did not meet the Asset Coverage Test in the Forward Purchase Agreement because of an undisclosed $15 million tenant improvement liability.

75.     Defendants knowingly, or but for their reckless disregard of the truth, misrepresented to Plaintiffs in the March 2023 Officer's Certificate and in the June 2023 Officer's Certificate that the representations and warranties of CSC in Section 4 of the Forward Purchase Agreement were true and correct in all material respects, that Defendants were in compliance with the covenants of Section 2 of the Forward Purchase Agreement, and that Defendants were not in breach in any material respect of the Forward Purchase Agreement or the Shareholders Agreement.

76.     Defendants knowingly, or but for their reckless disregard of the truth, omitted a $15 million tenant improvement liability for one of its largest properties, which liability should have been included in the Asset Coverage Test.

77.     Plaintiffs relied on Defendants' representation that CSC satisfied the Asset Coverage Test when agreeing to enter the Fifth Amended and Restated Forward Purchasing Agreement in March, 2023.

78.      Plaintiffs relied on Defendants' representation that CSC satisfied the Asset Coverage Test when agreeing to defer payments on dividends of Preferred Stock for 2023 and when agreeing to purchase shares of the Series P15 Series Preferred Stock in March and June 2023.

79.      As a direct and proximate result of their wrongful conduct, Plaintiffs suffered damages in an amount to be proven at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

80.      Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

81.      By reason of their superior knowledge and position as officers of CSC, Defendants had a duty to provide accurate information to Plaintiffs in connection with CSC's sale of Preferred Stock to Plaintiffs

82.      In connection with Plaintiffs' purchases of CSC preferred stock, Defendants supplied false information to Plaintiff.  Specifically, Defendants knew, or were negligent in not knowing that, at the time they sold Preferred Stock to Plaintiffs, CSC did not meet the Asset Coverage Test in the Forward Purchase Agreement because of an undisclosed $15 million tenant improvement liability.

83.      Defendants failed to exercise reasonable care in determining whether CSC met the Asset Coverage Test in connection with Plaintiffs' purchases of CSC Preferred Stock.

84.      Plaintiffs relied on the grossly miscalculated results of the Asset Coverage Test in agreeing to defer payments on dividends on Preferred Stock for 2023 and to purchases shares of the Series P15 Preferred Stock in March and June 2023.

85.      As a direct and proximate result of Defendants' negligent conduct, Plaintiffs suffered damages in an amount to be proven at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
## BREACH OF CONTRACT

86.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

87.     The Shareholders Agreement a contract between Plaintiffs and Defendants, among others.

88.     Section 5 of the Shareholders Agreement describes certain actions that may not be taken absent Orthogon approval, including the sale of material assets outside the ordinary course of business.  Defendants caused CSC to sell material assets outside the ordinary course of business, over Orthogon's objection.

89.     As a result of Defendants' breach, Plaintiffs suffered damages in an amount to be proven at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

90.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

91.     Defendants owed a fiduciary duty to Plaintiffs.

92.     Defendants breached their fiduciary duties to Plaintiffs by providing materially misstated information knowingly, or but for their reckless disregard of the trust, in connection with the issuance of CSC Preferred Stock and deferral of preferred dividends.

93.     Plaintiffs relied on the representations of the Defendants in purchasing the CSC Preferred Stock and deferring preferred dividends.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in an amount to be proven at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## UNJUST ENRICHMENT

95.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

96.     Plaintiffs conferred a benefit on Defendants when they purchased preferred stock from CSC and deferred preferred dividends.

97.     Defendants knew of the benefit.

98.     Defendants accepted and retained the benefit despite knowing that Plaintiffs purchased CSC's preferred stock based on materially misstated information supplied by Defendants.

99.     Defendants' acceptance and retention of the benefit is inequitable.

100.    Defendants should be required to disgorge any and all benefits they obtained for themselves in selling the preferred stock to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court issue judgment for Plaintiffs and against Defendants as follows:

a)      On all claims, awarding Plaintiffs such damages as are allowed by law and determined to have been sustained by it as a result of Defendants' wrongful conduct, in an amount to be proven at trial, but no less than $11.6 million;

b)      Awarding Plaintiffs their costs, expenses, disbursements, and attorneys' fees incurred in connection with this action, as well as pre- and post-judgment interest; and

c)      Granting Plaintiffs such other, further, and different relief as it finds just, necessary, and proper under the circumstances.

Dated:  August 29, 2025
   New York, NY

                 Respectfully submitted,

                 _____

                 Joshua D. Liston
                 BEYS LISTON & MOBARGHA LLP
                 641 Lexington Ave., 14th Floor
                 New York, NY 10022
                 (646) 755-3601
                 jliston@blmllp.com
                 *Attorneys for Plaintiffs*