UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORTHOGON CHARTER SCHOOL SPECIAL OPPORTUNITIES LLP, ORTHOGON CHARTER SCHOOL SPECIAL OPPORTUNITIES II, LP, and ORTHOGON CHARTER SCHOOL SPECIAL OPPORTUNITIES III, LLC,<br><br>Plaintiffs,<br>v.<br><br>STUART ELLIS and BRAD COBURN,<br><br>Defendants, | 25-CV-7193 (JMF)<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## PRELIMINARY STATEMENT

1. This case arises from a securities fraud perpetrated by Defendants Stuart Ellis ("Ellis") and Brad Coburn ("Coburn"), the Co-Founders, and respectively the Chief Executive Officer and Chief Financial Officer/Chief Investment Officer, of Charter School Capital, Inc. ("CSC" or the "Company"), a Portland, Oregon-based company that finances charter school facilities. Defendants induced Plaintiffs—three affiliated investment vehicles managed by Orthogon Partners—to invest $11.6 million in CSC preferred stock in March and June 2023 by providing fraudulent financial certifications that materially overstated CSC's net asset value by more than $13 million.

2. The fraud was straightforward. As a condition of each preferred stock purchase, CSC was required by the governing Forward Purchase Agreement to deliver an Officer's Certificate and an Asset Coverage Test demonstrating that CSC's net assets exceeded 80% of the preferred stock outstanding. Coburn signed the Officer's Certificates falsely certifying compliance. Both Defendants knew that the certifications were false: CSC had inflated its net

asset values by including approximately $16.8 million in tenant improvement for a property known as DuBois without deducting the corresponding and offsetting $16.8 million liability to fund those improvements. When the liability was properly included, the Asset Coverage Test failed—not marginally, but catastrophically, showing coverage ratios of 101% and 105% (against an 80% maximum)—meaning that CSC should never have received any of Plaintiffs' $11.6 million.

3. The evidence that both Defendants knew about the DuBois tenant improvement liability is overwhelming. Ellis personally discussed the DuBois liability in a January 5, 2023 email—two months *before* the first preferred stock purchase—instructing his subordinate on how to account for the $13 million (later revised to $16.8 million) in tenant improvements. Ellis supervised all aspects of CSC's real estate portfolio, which was "almost the only revenue source of CSC." He participated in the March 2, 2023 investor call with Plaintiffs immediately preceding the March preferred stock issuance, was copied on the Officer's Certificate and Asset Coverage Test transmitted on March 10, 2023, and personally drove all aspects of the preferred stock transactions. Coburn, who signed the false Officer's Certificates, was equally involved in the DuBois property and later attempted to manipulate the Asset Coverage Test's methodology to conceal the shortfall.

4. The fraud unraveled on August 30, 2023, during a call between Plaintiffs and Coburn, when James Lavelle of Orthogon noticed that the asset values Coburn was quoting for proceeds from a potential bond issuance did not match the figures CSC had previously provided. Orthogon asked for a reconciliation. Within days, CSC produced revised Asset Coverage Tests confirming that the March 2023 test had overstated Net Assets by $12,749,874 and the June 2023 test had overstated Net Assets by $13,205,269, an enormous figure. Both revised tests

showed that CSC had *failed* the 80% coverage requirement at the time of each preferred stock purchase.

5. Rather than acknowledge their wrongdoing and cooperate in returning Plaintiffs' capital, Defendants became hostile and evasive. Ellis told Plaintiffs on a September 7, 2023 call that the coverage misstatements were "YOUR [Orthogon's] problem," not CSC's. CSC thereafter restricted information access to Plaintiffs, refused to agree to any remedial framework, continued to sell and refinance real estate assets over Plaintiffs' objection, and used Plaintiffs' investment to fund CSC's operating expenses—including Defendants' combined annual compensation of approximately $864,000—rather than return the improperly obtained funds. CSC ultimately filed for bankruptcy.

6. Plaintiffs bring this action to recover their losses from the individual Defendants who orchestrated the fraud. Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, the Delaware Uniform Securities Act, and common-law claims for fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, and unjust enrichment.

## PARTIES

### Plaintiffs

7. Plaintiff Orthogon Charter School Special Opportunities LLP ("OCSSO") is a limited liability partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York. OCSSO is an investment vehicle managed by Orthogon Partners Investment Management, LLC ("Orthogon" or "OPIM").

8. Plaintiff Orthogon Charter School Special Opportunities II, LP (n/k/a Hive Charter School Special Opportunities, LP) ("OCSSO II") is a limited partnership organized

under the laws of the State of Delaware, with its principal place of business in New York, New York. OCSSO II is an investment vehicle managed by Orthogon.

9. Plaintiff Orthogon Charter School Special Opportunities III, LLC ("OCSSO III") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York, New York. OCSSO III is an investment vehicle managed by Orthogon. OCSSO III invested $7,600,000 in CSC Series P15 Preferred Stock on March 14, 2023 and an additional $4,000,000 on June 5, 2023 — the two transactions at the heart of this action.

10. OCSSO, OCSSO II, and OCSSO III are collectively referred to herein as "Plaintiffs." Each is a party to the Forward Purchase Agreement and Shareholders Agreement that govern Plaintiffs' investment in CSC preferred stock.

**Defendants**

11. Defendant Stuart Ellis ("Ellis") is an individual who, upon information and belief, resides in Portland, Oregon. Ellis is the Co-Founder, President, and Chief Executive Officer of CSC. Ellis has served as CEO of CSC since its founding nearly twenty years ago. He supervised all aspects of CSC's real estate portfolio, which was the Company's primary revenue source in its final years. He personally drove all aspects of the preferred stock transactions with Plaintiffs and was a signatory to the Shareholders Agreement in his individual capacity. Ellis is a former manager at Bain & Company and was named Ernst & Young Entrepreneur of the Year in 2011 for his co-founding of CSC.

12. Defendant Brad Coburn ("Coburn") is an individual who, upon information and belief, resides in Orinda, California. Coburn is the Co-Founder and Chief Financial Officer of CSC. Although Coburn later referred to himself as "Chief Investment Officer," he held himself

out as, and was introduced as, the CFO of CSC for years, and company materials consistently identified him as "Co-Founder and CFO." He signed the Officer's Certificates required under the Forward Purchase. Coburn is a former Managing Director at Countrywide Financial and former Vice President at Merrill Lynch, and holds an MBA from the Wharton School of the University of Pennsylvania.

**Relevant Non-Parties**

13. Charter School Capital, Inc. ("CSC" or the "Company") is a Delaware corporation headquartered in Portland, Oregon. CSC's business involves, *inter alia*, purchasing receivables owed to charter schools and financing charter school real estate. After an arbitration award by Plaintiffs against CSC, CSC filed for bankruptcy and its estate is being administered in separate proceedings. Plaintiffs' claims in this action are against Defendants individually, not against CSC.

14. Danielle Fisher ("Fisher") served as CSC's Finance and Accounting Manager. Fisher assisted in the preparation of the Asset Coverage Test calculations at Defendants' direction and supervision. She also communicated with Plaintiffs regarding closing documentation for the preferred stock transactions.

15. Brian Roberts ("Roberts") served as CSC's Vice President of Finance & Accounting. Roberts prepared and distributed monthly financial metrics to Plaintiffs.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over Plaintiffs' federal securities law claims pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims occurred in this District, including Plaintiffs' investment decisions, which were made from Orthogon's New York offices, and Defendants' communications with Plaintiffs in New York regarding the preferred stock transactions.

18. This Court has personal jurisdiction over Defendants because they transacted business in New York by, among other things, soliciting Plaintiffs' investment, transmitting fraudulent certifications to Plaintiffs in New York, and participating in calls and communications directed at Plaintiffs in New York.

## FACTUAL ALLEGATIONS

### A. CSC's Business and the Parties' Relationship

19. CSC was founded by Ellis, Coburn, and non-party John Hegelson. CSC's business included purchasing receivables owed to charter schools by state and local governments ("working capital") and financing charter school real estate facilities. By 2022, CSC's real estate portfolio had become, by far, its primary revenue source and business focus.

20. Plaintiffs are investment vehicles managed by Orthogon, a New York-based alternative investment manager. Beginning in 2020, Plaintiffs invested in CSC's Series P15 Preferred Stock pursuant to a Forward Purchase Agreement dated November 23, 2020, as amended (the "Forward Purchase Agreement" or "FPA"). Plaintiffs' investment relationship with CSC was also governed by an Amended and Restated Shareholders Agreement (the "Shareholders Agreement") and an Amended and Restated Certificate of Incorporation (the "Restated Certificate").

21. Rishi Ganti ("Ganti"), a principal of Orthogon, served as Orthogon's designee on the CSC Board of Directors. Ganti and James Lavelle ("Lavelle"), also of Orthogon, were the primary Orthogon personnel who communicated with Defendants regarding Plaintiffs' investments in CSC.

22. By early 2023, Plaintiffs, through OCSSO and OCSSO II, had invested a total of $27,000,000 in CSC's Series P15 Preferred Stock across three tranches in November 2020, April 2021, and December 2021. In 2023, OCSSO III invested an additional $11,600,000 in two tranches — $7,600,000 on March 14, 2023 and $4,000,000 on June 5, 2023 — in reliance upon Defendants' fraudulent certifications.

**B. The Forward Purchase Agreement and Asset Coverage Test Requirement**

23. Section 2(c) of the Forward Purchase Agreement imposed a critical investor protection: the "Asset Coverage Test." For each purchase of Series P15 Preferred Stock, CSC was required to demonstrate that "the aggregate amount of P15 Preferred outstanding (including accrued but unpaid dividends) may not exceed 80% of the Company's Net Assets." Importantly, for conservatism, Net Assets were to be "evaluated on a 'lower of cost or market' basis."

24. The Forward Purchase Agreement defined the qualifying Net Assets for the P15 Preferred as "(A) the aggregate amount of P8 Assets less the aggregate amount of P8 Preferred outstanding and (B) any other assets as may be approved by Investor in its sole discretion." Critically, these qualifying assets must be "in excess of liabilities."

25. Section 1(c)(ii) of the Forward Purchase Agreement required CSC to deliver, as a condition to each closing, "an Officer's Certificate executed by the Company's Chief Financial Officer" certifying, among other things, that "the Company is in and has at all times been in

compliance with the covenants in Section 2 in all material respects." This included compliance with the Asset Coverage Test.

26. The Officer's Certificate was a contractual representation by CSC upon which Plaintiffs were entitled to rely. It was, for Orthogon, a critical representation because it meant that the officers of CSC were putting themselves on the line for CSC's representation. The Officer's Certificate was designed to prevent precisely what occurred: the provision of false financial information to induce investment.

27. Section 2(e) of the Forward Purchase Agreement designated Plaintiffs as the "calculation agent" for the Asset Coverage Test. In practice, this role did not require (nor contemplate) that Plaintiffs would independently audit CSC's financial data or verify the accuracy of CSC's inputs. Rather, CSC provided the underlying financial data—including property values and liabilities—and prepared the Asset Coverage Test calculation. Plaintiffs' role as calculation agent was to verify the mathematical accuracy of the formula output given the inputs and, in the event of a dispute over the calculation, to have the final word unless CSC could demonstrate "clearly and convincingly" that Plaintiffs' determination was incorrect. If, as occurred here, CSC failed to provide information about $17 million in liabilities, the Asset Coverage Test would be drastically and materially incorrect even if Orthogon confirmed CSC's math.

## C. The DuBois Tenant Improvement Liability

28. The DuBois property was a charter school facility located in Riverdale, Georgia, owned through a CSC subsidiary. In December 2022, CSC entered into a lease amendment with the DuBois tenant pursuant to which CSC agreed to provide a tenant improvement allowance to finance the construction of a new three-story, approximately 30,000-square-foot middle school

building and related improvements (the "DuBois Improvements"). The lease amendment became effective January 1, 2023.

29. The DuBois Improvement Allowance — CSC's obligation to fund the construction costs — was substantial. As ultimately disclosed in a Preliminary Official Statement for a bond offering dated July 26, 2023 (the "POS"), the allowance was "an amount not to exceed $18,257,929." At the time of the March and June 2023 preferred stock purchases, the estimated value of the improvements was approximately $16.8 million, and CSC had paid only approximately $5.96 million toward the improvements as of June 2023.

30. The DuBois tenant improvement liability was a contractual obligation of CSC arising from a signed lease amendment. It was not a contingent or speculative liability; it was a fixed commitment to fund construction costs that CSC had already agreed to bear. The liability existed before both the March and June 2023 preferred stock transactions.

## D. Defendants' Knowledge of the DuBois Tenant Improvement Liability

31. Both Defendants knew about the DuBois tenant improvement liability well before the March 2023 preferred stock purchase. They had to; they created the liability as part of negotiating the DuBois lease amendment.

32. On January 5, 2023, Ellis sent an email to Fisher and Coburn regarding the DuBois expansion, stating: "Where has the Dubois expansion ($13mm) been included in the actuals YTD? The new lease has been signed (at least by the school) prior to the end of December and went into effect January 1st, I believe. Doesn't change the overall story for the Orthogon team." This email demonstrates that Ellis (a) knew about the DuBois tenant improvement liability; (b) knew its approximate magnitude; (c) knew the lease was signed and

effective; and (d) was personally directing how it would be reflected — or not reflected — in materials provided to Plaintiffs.

33. Fisher responded to Ellis that same day: "I haven't included it all since we do not have a fully executed lease and we have not deployed any cash. I do not think it is in the pipeline numbers." Ellis replied, directing that the liability "should be included however we normally count it," noting that "100% of the origination volume would occur at signing." Ellis concluded: "The rest of this conversation we can handle offline."

34. But when the Asset Coverage Test calculations were provided to Plaintiffs in connection with the March and June 2023 preferred stock purchases, Defendants failed to include the liability – *i.e.,* while CSC increased the gross asset value of the DuBois property by $16,635,598 to reflect the anticipated improvements, it did not make an offsetting increase to liabilities, enabling the Asset Coverage Tests to show as satisfied. As of June 2023, only $5,962,740 of the improvements had actually been paid for, meaning the DuBois property value alone was overstated by $10,672,858. Similar overstatements in other property values brought the total net asset overstatement to $13,205,269 for the June test.

35. The DuBois tenant improvement liability was not reflected on CSC's internal balance sheet at the time of the March and June 2023 transactions. However, it did appear as $16.8 million of "real estate origination volume" in the January month-end financial metrics that Roberts distributed on March 14, 2023. When Orthogon's Brian Lee asked Roberts in April 2023 why the $16.8 million in RE originations did not appear on the balance sheet, Roberts explained that "we signed a lease amendment w/ a tenant to provide them w/ $16.8mm of TI improvements w/ a corresponding rent increase as of 1/1" and that the improvements would be "reflected on the

balance sheet over the next 12-18mo" as the construction was completed. This confirmed that CSC recognized the liability internally but chose not to include it in the Asset Coverage Test.

## E. The March 2023 Preferred Stock Transaction

36. In early 2023, CSC requested that OCSSO III purchase $7,600,000 in Series P15 Preferred Stock. Ellis was personally involved in and drove all aspects of this transaction. On February 9, 2023, Ellis emailed Brian Lee at Orthogon and Fisher at CSC, with Coburn copied, referencing the specific amount of preferred equity being requested: "Danielle, I thought we had requested $7.6mm. Did that change?"

37. On March 2, 2023, Ellis participated in an update call with Plaintiffs, along with Coburn and Fisher, just prior to the preferred stock issuance. This call was one of the regular touchpoints between CSC management and Plaintiffs concerning CSC's operations and the pending investment.

38. On March 10, 2023, Chris Parnell of CSC's legal department emailed Plaintiffs' counsel and Orthogon personnel transmitting the closing documents, including the Officer's Certificate and Asset Coverage Test. Ellis was copied on this email. The email attached: (1) a Receipt; (2) a Consent; (3) a Subscription Agreement; (4) the Officer's Certificate; and (5) the Asset Coverage Test.

39. On March 14, 2023, OCSSO III purchased $7,600,000 in Series P15 Preferred Stock in reliance upon the Officer's Certificate and Asset Coverage Test. The March Asset Coverage Test, as later revised and corrected by Coburn in September 2023, showed that the true Net Assets were $36,928,749—not $49,678,623 as originally represented. The P15 Preferred Outstanding plus Accrued Dividends totaled $37,153,728, yielding a coverage ratio of 101%—

meaning CSC had *failed* the 80% test by a wide margin. Had this been correctly reported, Plaintiffs would never have funded the March purchase.

## F. The June 2023 Preferred Stock Transaction

40. In May and June 2023, CSC requested that OCSSO III purchase an additional $4,000,000 in Series P15 Preferred Stock. Ellis was copied on significant communications leading up to the issuance, including the transmission of closing documents by Claire Benjamin of CSC's legal department on June 5, 2023, attaching "the fully executed set of closing documents, along with the shareholder schedule."

41. On June 1, 2023, Fisher distributed the Asset Coverage Test for the June issuance to Orthogon and CSC personnel. Notably, Ellis was not included on the distribution of the Asset Coverage Test itself, though he was copied on the closing documents. The Asset Coverage Test was prepared by Fisher under the direction of Defendants.

42. On June 5, 2023, OCSSO III purchased $4,000,000 in Series P15 Preferred Stock in reliance on the Officer's Certificate and Asset Coverage Test. The June Asset Coverage Test, as later revised and corrected by Coburn in September 2023, showed that true Net Assets were $40,386,627 — not $53,591,896 as originally represented — while P15 Preferred Outstanding plus Accrued Dividends totaled $42,563,801. This yielded a coverage ratio of 105%, meaning CSC had again *failed* the 80% test by a wide margin. As with the March transaction, had this been correctly reported, Plaintiffs would not have funded the June purchase.

## G. The Nature and Magnitude of the Overstatement

43. The overstatement of Net Assets was not a matter of accounting judgment or ambiguity. CSC inflated property values by including the anticipated value of tenant improvements that had not yet been completed or paid for, while simultaneously excluding the offsetting liability to fund those improvements. For the DuBois property, CSC listed a "Purchase Price" of $9,000,000 plus "DuBois 2 Improvements" of $16,635,598 in the original Asset Coverage Test. But as of June 2023, only $5,962,740 of the improvements had been completed and paid for. This alone overstated the DuBois property's value by $10,672,858.

44. Similar overstatements existed for other properties. When CSC's Coburn and Fisher produced revised Asset Coverage Tests in September 2023, the revisions revealed total Net Asset overstatements of $12,749,874 in the March test and $13,205,269 in the June test. The loan balances were also updated to be $2,503,496 lower in the June test, partially offsetting the misstatement, but confirming that the original figures were wrong in multiple respects.

45. The Forward Purchase Agreement required Net Assets to be "evaluated on a 'lower of cost or market' basis." Section 2(c). CSC violated this requirement by including the full anticipated improvement value as an asset without deducting the unfunded liability. There is no sensible interpretation of the Forward Purchase Agreement's "lower of cost or market" standard that would justify excluding a $16.8 million contractual liability from the coverage calculation while including the corresponding asset value.

## H. The Failed Bond Issuance and the POS Disclosure

46. In July 2023, CSC attempted to issue approximately $43.5 million in revenue bonds through an entity called WFCS Holdings III, LLC ("Wonderful Foundations III" or "WF3"). The bond offering was to be secured by CSC's real estate portfolio, including the

DuBois property. On July 27, 2023, Coburn emailed the Preliminary Official Statement ("POS") for the bond offering to Plaintiffs.

47. Significantly, the POS disclosed the DuBois tenant improvement liability in detail. A section titled "Tenant Construction Projects" described the DuBois Improvement Allowance of "an amount not to exceed $18,257,929," which the landlord (CSC's subsidiary) had "agreed to provide" to finance construction of improvements. The POS thus confirmed that Defendants had disclosed the DuBois tenant improvement liability to the bond market and its underwriters, while concealing it from Plaintiffs in the Asset Coverage Test calculations provided just months earlier.

48. The WF3 bond offering ultimately failed. Ellis and Coburn "ran all aspects of the bond issuance," from the offering memorandum to pricing to liaising with the investment bank. The failure of the bond offering was a continuing sign of CSC's deteriorating financial condition and further evidences Defendants' intimate familiarity with the real estate portfolio's liabilities.

**I. Discovery of the Fraud: The August 30, 2023 Call**

49. In late August 2023, CSC requested that Plaintiffs invest an additional $2.6 million of preferred equity to fund the acquisition of a property known as Prescott Valley. CSC provided a new Asset Coverage Test calculation for this potential investment. Plaintiffs identified several errors in the new test, including failure to include accruals on the preferred, double counting of cash, and omission of senior debt. All of these functioned to make the test look more satisfied than it was.

50. On August 26, 2023, Fisher emailed Lavelle, copying Coburn and Ellis, confirming that even under CSC's own calculation, the Asset Coverage Test could not be met: "I

have reviewed the asset coverage test and it looks like you are correct. With the additional P15 accruals we do not meet the 80% test."

51. On August 28, 2023, Fisher emailed Lavelle again, stating: "Per discussion with Stuart, attached is the asset coverage test. We are showing 2 different approaches." The email presented an alternative "market value approach" that valued the real estate assuming an 8% exit cap rate, under which CSC claimed to pass the 80% test with "$1.3mm of cushion." This alternative methodology was not permitted under Section 2(c) of the Forward Purchase Agreement, which explicitly required a "lower of cost or market" basis. The "per discussion with Stuart" language confirms that Ellis personally directed the Asset Coverage Test methodology.

52. On August 30, 2023, a call was held among Lavelle and Ganti of Orthogon and Ellis, Coburn, and Fisher of CSC. During this call, Coburn mentioned an estimate of expected proceeds from the potential sale of several existing real estate assets. Lavelle pointed out that this estimate was substantially larger than the values for those assets shown in the Asset Coverage Test calculations CSC had provided. Coburn confessed that approximately $17 million in tenant improvements for the DuBois property had been included in the asset value, but the corresponding liability had not been deducted.

53. Later on August 30, 2023, Lavelle emailed Fisher, copying Coburn and Ellis: "One additional question on the asset coverage test. Do the amounts in the improvements column need to be reduced by the expected costs of such improvements, in cases where we (or the bondholders) would be funding them?" This inquiry formalized the discovery that the Asset Coverage Test had been materially misstated.

54. Defendants' claim that the omission was an innocent error. But this characterization is contradicted by the facts: (a) both Defendants knew about the DuBois tenant

improvement liability from its inception in January 2023; (b) Ellis personally discussed how the liability should be accounted for; (c) the liability was disclosed to the bond market in the July 2023 POS; and (d) Defendants' subsequent conduct — hostility, information restriction, and refusal to cooperate — is inconsistent with innocent error.

**J. Defendants' Post-Discovery Conduct**

55. In the days following the August 30 discovery, CSC did not immediately produce written confirmation of the error. Plaintiffs contacted counsel on September 5, 2023 and spent approximately ten hours in discussions about the matter that day alone.

56. On a September 5 call, Coburn verbally confirmed that the $17 million DuBois liability had been omitted from prior coverage tests. He noted that "there were many ways to calculate net asset value," but Ganti immediately replied that no alternative method could possibly cover the omission of $16 million in liabilities.

57. On September 7, 2023, during a regularly scheduled biweekly call, Ellis argued that "alternative measures" could show the coverage tests would have been satisfied. Ganti replied that this was implausible and irrelevant, since the investment was made based on the tests actually provided. The tone of the call was acrimonious, with Ellis yelling, "This is YOUR [Orthogon's] problem."

58. On September 8, 2023, CSC produced "corrected" coverage tests for March and June, which showed both tests had failed. Yet even these revised tests still contained apparent errors, including double counting of cash, that functioned to make the tests look better than they actually were. CSC also provided alternative calculations using a "market value" methodology that was not permitted under the Forward Purchase Agreement and that still failed for the June test.

59. CSC continued to revise its calculations through September 11, 2023. Each revision confirmed that the original coverage tests were materially misstated and that both tests would have failed under any correct calculation.

60. On September 11, 2023, Coburn acknowledged to Ganti and Lavelle that the coverage tests had failed. When asked about CSC's response, Coburn said, "I imagine the [preferred] investors will want their money back." Despite this acknowledgment, Defendants made no effort to return Plaintiffs' capital.

61. Instead, Ellis maintained an aggressive posture. On September 20, 2023, Ellis told Plaintiffs that CSC was concerned about liability to OCSSO and OCSSO II if CSC agreed to prioritize repayment of OCSSO III's investments — effectively trying to use the interests of Plaintiffs' own affiliated entities as a shield against accountability. On September 26, 2023, Ellis "didn't see why CSC had to agree to anything" and expressed confidence that Plaintiffs would not sue.

62. CSC began restricting information access to Plaintiffs in the fall of 2023—refusing to answer questions, declining to provide financial data, and generally becoming evasive. This was in stark turnabout from the prior relationship, where Defendants had regular calls and provided financial updates to Plaintiffs.

## <u>K. Ellis's Direction of Alternative Asset Coverage Test Methodologies</u>

63. After the fraud was uncovered, Ellis directed Fisher to present alternative Asset Coverage Test methodologies designed to minimize the apparent shortfall. As noted above, Fisher's August 28, 2023 email to Plaintiffs presented alternative calculations and expressly noted they were "per discussion with Stuart." When the initial corrected tests showed CSC had failed the coverage requirement, Ellis directed still further revisions using a "market value

approach" that valued the real estate at an 8% exit cap rate—a methodology not permitted under the Forward Purchase Agreement's express requirement of a "lower of cost or market" basis.

64. Even under this impermissible alternative methodology, the revised test was "riddled with calculation errors," as Lavelle promptly pointed out. The errors included: (1) double counting of $2.6 million in cash intended for the new Prescott Valley property that was also included in the total net asset figure; and (2) assuming the new Prescott Valley property would have no associated debt, when it was expected to be funded with approximately 60% loan-to-value borrowing. These errors were, not coincidentally, all designed to make CSC look less fraudulent.

**L. CSC's Financial Condition and Defendants' Motive**

65. In early 2023, CSC was in severe financial distress. CSC was "effectively going bankrupt" and was using the preferred equity infusions from Plaintiffs to fund operations, including meeting payroll. CSC was also "refinancing" properties — pulling equity out of them, similar to a home equity line of credit — not to pay investors, but rather to pay salaries.

66. As of September 2023, CSC did not have more than six months of operating cash reserves. By November 2023, CSC had informed Plaintiffs that while it previously believed it had cash through March 2024, it was now concerned it did not have cash through January 2024.

67. Ellis and Coburn each received annual salary of $432,053 for the fiscal year ending June 30, 2023, increased to $451,500 for the fiscal year ending June 30, 2024. Their combined annual compensation was approximately $864,000 to $903,000, exclusive of bonuses. Annual bonuses were tied to a pool not to exceed 15% of EBITDA under Section 5.2(d) of the Shareholders Agreement, which amounted to $76,174 in 2022, $0 in 2023, and $107,443 in

2024. In addition, Defendants' non-cash compensation was approximately $27,054 in FY 2024 for each Defendant.

68. Defendants had a powerful motive to conceal the failure of the Asset Coverage Test: CSC's continued operations — and Defendants' salaries, compensation, and equity positions — depended on Plaintiffs' continued investment. Without Plaintiffs' $11.6 million in 2023, CSC could not have continued operating. Had Plaintiffs known the Asset Coverage Test was not satisfied, they would not have invested, and CSC would have faced an immediate liquidity crisis requiring restructuring. Such restructuring would likely have resulted in the elimination of Defendants' equity positions and the potential loss of their compensation.

## M. Defendants' Self-Dealing

69. In a further demonstration of Defendants' prioritization of their personal interests over Plaintiffs' investment, Defendants caused CSC to make a $700,000 unsecured loan to a CSC subsidiary at a 16% interest rate. This related-party transaction was approved in what Ganti described as a "shotgun board meeting." Plaintiffs voted against the loan on the grounds that it was self-dealing, but Defendants overruled the objection, claiming, absurdly, that the transaction in which they loaned CSC money at a high interest rate was at arm's length. The 16% interest rate inured to Defendants' benefit as equity holders and effectively subordinated Plaintiffs' preferred stock position.

70. Following the discovery of the coverage test misstatements, CSC also engaged in emergency sales of equity interests in real estate subsidiaries without Plaintiffs' required approval. When Plaintiffs objected and reminded CSC that such sales required Orthogon's approval under the Shareholders Agreement, CSC denied that approval was required.

**N. The Framework Agreement, Arbitration, and CSC's Continued Breach**

71. Following the discovery of the coverage test misstatements and months of fruitless negotiations, Plaintiffs and CSC executed the "CSC Preferred Stock Framework" (the "Framework") on June 24, 2024. The Framework was intended to forestall litigation and provide for an orderly restructuring and liquidation of CSC's assets to return Plaintiffs' improperly obtained investment. The Framework included, among other terms, a restructuring plan, a distribution waterfall governing how proceeds from asset monetization would be paid to Plaintiffs, and a requirement that Orthogon have approval rights over "Major Actions," defined to include "all real estate disposals (refinancings, etc.) and monetization, or financing of other fee streams."

72. The Framework expressly stated: "While CSC and Orthogon are working together in good faith toward final documentation, each side agrees to abide by the terms set forth in this document. This includes Orthogon entering into a tolling agreement to refrain from filing claims and requiring CSC to agree with Orthogon on the use of asset monetization proceeds." Plaintiffs upheld their obligation by refraining from filing suit. CSC did not uphold its obligations.

73. Despite the express terms of the Framework, CSC — acting under the direction of Ellis and Coburn — breached the Framework by proceeding with real estate transactions involving properties known as Kiddinu and Building Hope in November 2024 (the "November Transactions") without obtaining Plaintiffs' approval and by unilaterally determining the disposition of the approximately $4 million in proceeds from those transactions. Plaintiffs received none of these proceeds.

74. Ellis testified at the arbitration hearing that he believed the Framework "was an agreement to agree, and its terms would not become binding until there had been final documentation, including the tolling agreement." This testimony reflected Ellis's pattern of

disregarding his obligations to Plaintiffs while taking the benefit of their forbearance—the same pattern that characterizes the underlying fraud.

75. On May 22, 2025, Arbitrator John Bickerman issued a Final Award in AAA Case No. 01-24-0009-2550, finding in Plaintiffs' favor and against CSC. The Arbitrator made the following findings relevant to this action:

(a) The Arbitrator found that "a correct Asset Coverage Test would have failed because a fifteen-million-dollar liability had been omitted from the balance sheet" and that "[i]ncluding this liability, not only would there not have been a surplus of assets to provide security against the funds invested, but the correct balance sheet would have shown the company was already underwater."

(b) The Arbitrator found that "had Orthogon been provided an accurate test result, it would not have invested in CSC."

(c) The Arbitrator found that "CSC sold [preferred] stock in violation of the key condition that Orthogon required" and that "[t]he assets were insufficient to protect the investment."

(d) The Arbitrator found that CSC breached the Framework by ignoring Plaintiffs' approval rights over the November Transactions and "unilaterally determined the disposition of assets from that transaction," finding that CSC "acted unilaterally in violation of the express terms of the Framework."

(e) The Arbitrator found Ellis's testimony that he owed Orthogon no duties until final documentation was completed to be "unreasonable," noting that "CSC and its officers benefited from the forbearance of Orthogon not to pursue legal action that could have forced CSC into bankruptcy."

(f) The Arbitrator awarded Plaintiffs damages of $2,840,666.97, attorneys' fees of $213,975.00, costs of $7,234.49, pre-judgment interest at 5% per annum from November 13, 2024, and post-judgment interest at 4.5% per annum.

76. The arbitration was brought against CSC as an entity and resolved claims arising under the Framework. The Arbitrator expressly noted that "[f]or the purposes of this final award, there is no need to determine intent." The arbitration did not adjudicate Plaintiffs' fraud and securities claims against Ellis and Coburn, which are asserted for the first time in this action. The Arbitrator's factual findings regarding the falsity of the Asset Coverage Test, the materiality of the omission, and Plaintiffs' reliance are, however, corroborative of the allegations set forth herein.

77. Defendants' conduct in connection with the Framework further demonstrates their scienter and pattern of bad faith toward Plaintiffs. Having obtained $11.6 million through fraudulent certifications, Defendants then took the benefit of Plaintiffs' forbearance under the Framework — which prevented Plaintiffs from suing while CSC continued to operate — and then breached the Framework by disposing of assets without Plaintiffs' approval for Defendants' continued benefit. The Arbitrator found this conduct warranted an award of attorneys' fees because "the officers of CSC ignored their obligations under the Framework."

## <u>O. Plaintiffs' Damages</u>

78. As a direct result of Defendants' fraud, OCSSO III invested $11,600,000 in CSC preferred stock ($7,600,000 in March 2023 and $4,000,000 in June 2023) that it would not have invested but for the false Asset Coverage Tests and Officer's Certificates.

79. In addition, Plaintiffs have been deprived of significant accrued and unpaid preferred dividends. As of February 17, 2026, the total outstanding amounts across all Plaintiff entities, including original principal and accrued unpaid dividends, are as follows:

**Charter School Capital - Preferred Equity Outstanding Summary**

| Issue Date | Purchase Price | Dividends Unpaid | Total Outstanding | *Accrual Per Day* |
|---|---|---|---|---|
| 11/23/2020 | 12,000,000 | 7,528,264 | 19,528,264 | *7,264* |
| 4/30/2021 | 10,000,000 | 6,659,953 | 16,659,953 | *6,500* |
| 12/3/2021 | 5,000,000 | 3,321,370 | 8,321,370 | *3,240* |
| **OCSSO II** | **27,000,000** | **17,509,587** | **44,509,587** | ***17,005*** |
| 3/14/2023 | 7,600,000 | 5,737,842 | 13,337,842 | *7,126* |
| 6/5/2023 | 4,000,000 | 2,718,303 | 6,718,303 | *3,589* |
| **OCSSO III** | **11,600,000** | **8,456,145** | **20,056,145** | ***10,715*** |
| **Total** | **38,600,000** | **25,965,732** | **64,565,732** | ***27,720*** |

Note: *Dividend accruals calculated through 2/17/2026. Amounts in USD.*
*OCSSO II = Orthogon Charter School Special Opportunities II, LP*
*OCSSO II has been renamed Hive Charter School Special Opportunities, LP*
*OCSSO III = Orthogon Charter School Special Opportunities III, LLC*

80. Had Plaintiffs known the true state of the Asset Coverage Test, they would not have funded the March or June 2023 preferred stock purchases. They would have demanded a restructuring of CSC to avoid bankruptcy or as part of a bankruptcy, which would have involved removal of Ellis' supervoting control, renegotiation of their compensation at the very least, and potential sale of CSC to a third party. Plaintiffs also would not have agreed to defer preferred dividends due in June and December 2023. The Arbitrator independently confirmed this finding, concluding that "had Orthogon been provided an accurate test result, it would not have invested in CSC."

## CAUSES OF ACTION

### COUNT ONE

**Violation of Section 10(b) of the Securities Exchange Act of 1934**
**and Rule 10b-5 Promulgated Thereunder**
*(Against Both Defendants)*

81. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

82. Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, in connection with the purchase and sale of securities, knowingly or recklessly: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

83. Specifically, Coburn, as Chief Financial Officer of CSC, signed and caused to be delivered to Plaintiffs Officer's Certificates in connection with the March 14, 2023 and June 5, 2023 preferred stock purchases falsely certifying that CSC was "in and has at all times been in compliance with the covenants in Section 2 in all material respects" of the Forward Purchase Agreement, including the Asset Coverage Test. These certifications were false because, as Defendants knew, the Asset Coverage Test calculations omitted approximately $13 to $16.8 million in tenant improvement liabilities, causing the test to appear satisfied when it was not.

84. Ellis, as Chief Executive Officer of CSC, participated in a fraudulent scheme and course of conduct to induce Plaintiffs' investment by, among other things: (a) supervising all

aspects of CSC's real estate portfolio, including the DuBois property from which the concealed liability arose; (b) personally discussing and directing the accounting treatment of the DuBois tenant improvement liability in January 2023; (c) driving all aspects of the preferred stock transactions with Plaintiffs; (d) participating in investor calls with Plaintiffs immediately preceding the March 2023 transaction; (e) being copied on and receiving the Officer's Certificates and Asset Coverage Tests transmitted to Plaintiffs; (f) directing Fisher to present alternative Asset Coverage Test methodologies designed to minimize the apparent shortfall after the fraud was discovered; and (g) acting as the ultimate authority over CSC's financial reporting and investor communications as CEO. Ellis's conduct constitutes participation in a fraudulent scheme under Rule 10b-5(a) and (c).

85. The misstatements and omissions described herein were material. Had Plaintiffs known the true state of the Asset Coverage Test, they would not have purchased the March and June 2023 preferred stock. The Net Asset overstatement of more than \$12.7 million (March) and \$13.2 million (June) on a sub-\$50 million portfolio was far too large to be dismissed as immaterial.

86. Defendants acted with scienter — *i.e.*, they acted knowingly or with severe recklessness—in making and/or causing to be made the false certifications and in concealing the DuBois tenant improvement liability from the Asset Coverage Test calculations. The facts supporting a strong inference of scienter include: (a) Ellis's January 5, 2023 email demonstrating actual knowledge of the DuBois liability before the March transaction; (b) both Defendants' intimate involvement with the DuBois property and CSC's real estate operations; (c) the disclosure of the DuBois liability to the bond market in the July 2023 POS while it remained concealed from Plaintiffs; (d) the extraordinary magnitude of the omission (\$13 to \$17 million

on a sub-$50 million portfolio), which strains credulity to suggest was inadvertent; (e) Defendants' powerful financial motive—their salaries and CSC's continued existence depended on Plaintiffs' investment. Without Plaintiffs' investment, CSC would have immediately failed and the Defendants left without income; (f) Defendants' hostile and evasive conduct following discovery of the misstatement; and (g) the Arbitrator's independent finding that the Asset Coverage Test was materially false, that the company was "already underwater," and that Plaintiffs would not have invested had they been provided accurate information, as well as the Arbitrator's finding that Ellis's testimony regarding his obligations under the subsequent Framework was "unreasonable."

87. Plaintiffs justifiably relied on Defendants' false certifications in making their investment decisions. The Forward Purchase Agreement required CSC to deliver Officer's Certificates as a condition of each closing, and Plaintiffs were contractually entitled to rely on those representations. Plaintiffs' role as "calculation agent" under the Forward Purchase Agreement did not impose a duty to independently audit CSC's underlying financial data; it addressed only the mathematical accuracy of calculations based on the inputs CSC provided. The DuBois tenant improvement liability was a fact peculiarly within Defendants' knowledge that was not ascertainable through ordinary board-level access or review of the calculations as presented.

88. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered losses. The fraud induced Plaintiffs to enter into the March and June 2023 transactions — transactions they would not have entered but for the fraud. The Arbitrator independently confirmed this, finding that "had Orthogon been provided an accurate test result, it would not have invested in CSC." The concealed risk — CSC's undercapitalization and inability to satisfy

its obligations — materialized through CSC's financial deterioration and ultimate bankruptcy. The Arbitrator found that including the omitted liability, "the correct balance sheet would have shown the company was already underwater." The August 30, 2023 discovery and CSC's subsequent production of corrected Asset Coverage Tests constituted corrective events confirming the falsity of Defendants' prior representations.

## COUNT TWO

**Violation of Section 20(a) of the Securities Exchange Act of 1934**
*(Against Both Defendants)*

89. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

90. Ellis and Coburn were "control persons" of CSC within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). As Co-Founders, CEO and CFO respectively, and as CSC's only senior executives, Defendants had the power to direct and did direct CSC's management, operations, and policies, including the preparation of financial certifications and communications with investors. Defendants possessed and exercised the power to control CSC's compliance with the Forward Purchase Agreement and the accuracy of the Officer's Certificates and Asset Coverage Tests.

91. By reason of their control over CSC, Defendants are jointly and severally liable for the primary violations of Section 10(b) and Rule 10b-5 alleged herein. Defendants did not act in good faith and directly or indirectly induced the acts constituting the violations.

## COUNT THREE

**Violation of the Delaware Uniform Securities Act, 6 Del. C. § 7323**
*(Against Both Defendants)*

92. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

93. Each Plaintiff is a limited partnership or limited liability company organized under the laws of the State of Delaware. CSC is a Delaware corporation. The Forward Purchase Agreement and Shareholders Agreement are governed by Delaware law and were executed in connection with securities of a Delaware corporation.

94. Defendants, in connection with the offer, sale, or purchase of securities, directly or indirectly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of 6 Del. C. § 7323.

95. Defendants were "sellers" within the meaning of the Delaware Securities Act because they personally solicited Plaintiffs' investment, motivated at least in part by their own financial interest in the transactions. Only Ellis and Coburn pitched the preferred stock to Plaintiffs. As manager-shareholders of CSC who received substantial compensation funded by CSC's operations, Defendants received a direct personal financial benefit from each preferred stock sale.

96. Defendants knew, or in the exercise of reasonable care should have known, that their statements and omissions were false and misleading.

97. As a direct and proximate result of Defendants' violations, Plaintiffs have suffered damages as alleged herein.

## COUNT FOUR

**Common Law Fraud**
*(Against Both Defendants)*

98. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

99. Defendants made affirmative misrepresentations of material fact to Plaintiffs, including but not limited to: (a) Coburn's execution and delivery of Officer's Certificates on or about March 10, 2023 and June 1, 2023, falsely certifying CSC's compliance with the Asset Coverage Test; (b) the delivery of Asset Coverage Test calculations that materially overstated CSC's Net Assets by omitting approximately $13 to $16.8 million in tenant improvement liabilities; (c) Defendants' oral representations on investor calls regarding CSC's financial condition and the adequacy of asset coverage for the preferred stock; and (d) Ellis's direction of alternative Asset Coverage Test methodologies designed to conceal the shortfall.

100. These misrepresentations were distinct from any breach of the contractual covenants contained in the Forward Purchase Agreement. The Officer's Certificates were affirmative, extra-contractual representations of fact that went beyond mere performance of contractual duties. Defendants did not merely fail to comply with the Asset Coverage Test; they affirmatively and falsely represented that CSC was in compliance when they knew or recklessly disregarded that it was not.

101. Defendants made these misrepresentations knowingly or with reckless disregard for their truth or falsity, with the intent to induce Plaintiffs' reliance, and Plaintiffs justifiably relied thereon in making the March and June 2023 preferred stock purchases.

102. As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered damages including the loss of their $11,600,000 investment and accrued dividends.

## COUNT FIVE

**Negligent Misrepresentation**
*(Against Both Defendants)*

103. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

104. In the alternative to Count Four, Defendants negligently made misrepresentations of material fact to Plaintiffs in the course of the parties' business relationship. Defendants were in the business of supplying information to Plaintiffs — specifically, financial information regarding CSC's asset coverage and compliance with the Forward Purchase Agreement — for the guidance of Plaintiffs in their investment decisions. Defendants had unique and superior knowledge of CSC's real estate portfolio, its liabilities, and the DuBois tenant improvement obligation.

105. Defendants failed to exercise reasonable care in the preparation and delivery of the Officer's Certificates and Asset Coverage Test calculations. Plaintiffs justifiably relied on this information in making their investment decisions. As a direct and proximate result, Plaintiffs suffered damages.

## COUNT SIX

**Breach of Contract**
*(Against Both Defendants)*

106. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

107. Defendants, as signatories to the Shareholders Agreement in their individual capacities and as shareholders of CSC, had obligations under the Shareholders Agreement,

including Section 5.2, which restricted the sale, transfer, or disposition of material Company assets without the approval of the holders of the preferred stock.

108. Defendants breached the Shareholders Agreement by causing CSC to sell, transfer, and refinance real estate assets and equity interests in real estate subsidiaries without obtaining Plaintiffs' required approval, over Plaintiffs' express objection. When Plaintiffs reminded Defendants that such transactions required Orthogon's approval, Defendants denied that approval was required.

109. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered damages including the diminution in value of their preferred stock position and the dissipation of assets that would otherwise be available to satisfy Plaintiffs' claims.

## COUNT SEVEN

**Breach of Fiduciary Duty**
*(Against Both Defendants)*

110. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

111. As officers and directors of CSC, a Delaware corporation, Defendants owed fiduciary duties of care and loyalty to Plaintiffs as holders of preferred stock.

112. Defendants breached their fiduciary duties to Plaintiffs by: (a) fraudulently inducing Plaintiffs to purchase preferred stock in March and June 2023 through the delivery of false Officer's Certificates and materially misstated Asset Coverage Tests; (b) fraudulently inducing Plaintiffs to defer preferred dividends due in June and December 2023 by concealing CSC's true financial condition; (c) approving a $700,000 self-dealing loan to a CSC subsidiary at 16% interest over Plaintiffs' objection; and (d) using Plaintiffs' preferred equity investment to

fund CSC's operating expenses, including Defendants' own compensation, rather than deploying it as represented.

113. These claims are direct, not derivative. Plaintiffs suffered individualized harm distinct from any harm to CSC generally: Plaintiffs were specifically and uniquely induced to make the March and June 2023 investments and to defer dividends through misrepresentations directed at them. No other CSC stockholder was similarly situated or similarly harmed. Any recovery would flow to Plaintiffs directly, not to the corporation.

114. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs have suffered damages.

## COUNT EIGHT

**Unjust Enrichment**
*(Against Both Defendants, in the Alternative)*

115. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

116. In the alternative to the contract-based claims, Defendants have been unjustly enriched at Plaintiffs' expense. Plaintiffs' $11,600,000 investment in 2023, obtained through fraud, was used to fund CSC's operations, including Defendants' combined annual compensation of approximately $864,000–$888,000. Defendants also benefited from the $700,000 self-dealing loan at 16% interest.

117. It would be inequitable for Defendants to retain the benefits derived from Plaintiffs' investment, which was obtained through fraudulent certifications. Defendants have been unjustly enriched at Plaintiffs' expense and should be required to disgorge the benefits they received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

(a) Compensatory damages in an amount to be determined at trial, including but not limited to $11,600,000 in principal, plus accrued and unpaid preferred dividends;

(b) Rescissory damages or, in the alternative, benefit-of-the-bargain damages;

(c) Consequential damages;

(d) Disgorgement of all profits, benefits, and other compensation obtained by Defendants as a result of their wrongful conduct;

(e) Pre-judgment and post-judgment interest at the maximum legal rate;

(f) Attorneys' fees and costs of suit; and

(g) Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: New York, New York
February 19, 2026

Respectfully submitted,

LISTON LLP

By: /s/ Joshua D. Liston

Joshua D. Liston
43 W. 43rd Street, Suite 407
New York, NY 10036
Tel: (646) 397-1960
Email: jliston@listonllp.com

*Attorneys for Plaintiffs*